UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOHN BRIER, et al.,

    Plaintiffs,

v().    Case No. 3:16cv142-MCR-CJK

KEITH DE CAY,

    Defendant.

_____/

REPORT AND RECOMMENDATION

This matter is before the court on the parties' cross motions for summary judgment (doc. 16 and 20), responses (docs. 21 and 24), and plaintiffs' reply (doc. 25).[1] The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(E). Having fully considered the parties' submissions, the record, and the relevant case law, the undersigned recommends plaintiffs' motion for summary judgment be granted and defendant's motion for summary judgment be denied.

BACKGROUND AND PROCEDURAL HISTORY

In their complaint, plaintiffs assert a claim against defendant for breach of contract, stemming from defendant's alleged breach of a settlement agreement intended to resolve a dispute between plaintiffs and a third party, Billy Wayne Davis, over a speculative real estate investment in Long Island, Bahamas. In early

---

[1] Defendant, who is proceeding *pro se*, filed a counterclaim (doc. 6) against the plaintiffs.

2013, plaintiff John Brier responded to an online advertisement for undeveloped ocean front lots offered for sale for $40,000. Doc. 17. Albert Jansen, a sales agent from Coral Gables, Florida, acting on behalf of Long Islands Investments, LTD ("Long Islands"), contacted Mr. Brier. *Id.* Long Islands was owned and operated by Mr. Davis, of Crenshaw, Georgia. *Id.* Mr. Jansen and Mr. Davis indicated the lots soon would be selling for hundreds of thousands of dollars because a foreign investment group intended to invest $20,000,000 into the development of a subdivision on the subject property. *Id.* The sellers also told Mr. Brier famous people, such as Joe Montana, were involved with the project. *Id.*

In May 2013, Mr. Brier decided to purchase one of the lots. *Id.* After receiving a conveyance deed in the mail, however, he noted certain errors, including incorrect names of the seller and project, an incorrect sales price, and a false notarized statement indicating Mr. Brier was present in the Bahamas at the time of the sale. *Id.* Mr. Brier contacted the sellers about the discrepancies, and they reassured him they were mistakes and would be corrected; but Mr. Brier never received a corrected deed. *Id.* After investigating the matter and speaking to other individuals, Mr. Brier was told the lot should not have been sold because it was not part of an approved subdivision development and the validity and value of title to the property were questionable without such approval. *Id.* Because those facts

had not been disclosed by the sellers, Mr. Brier repeatedly requested a refund of the purchase price. *Id.*

After he received no refund and suspected the sellers had taken advantage of him, Mr. Brier purchased a web domain, www.BahamasLandSales.com to warn others of what he considered to be a fraudulent scheme and locate other investors, several of whom contacted him.[2] *Id.* In December 2014, Mr. Brier contacted the FBI and requested it investigate the matter. *Id.* The plaintiffs discovered Mr. Davis was a convicted felon who had been named in multiple lawsuits regarding alleged fraudulent land deals in the Bahamas. *Id.*

Several months later, in March 2015, the sellers expressed interest in settling the matter due, in plaintiffs' estimation, to the negative publicity and criminal investigation. *Id.* On March 7, 2015, defendant Keith De Cay contacted plaintiffs, claiming he was "'acting as a liaison'" to convey an "'offer from Billy [Davis].'" *Id.* Mr. De Cay informed plaintiffs that he alone would be dealing with them insofar as their investments were concerned. *Id.* He proposed several settlement terms, including deactivating the websites Mr. Brier created, an option for Mr. Davis to buy the lots back from the plaintiffs at 20 percent above the costs plaintiffs paid, and an option for Mr. De Cay to personally buy the property back. *Id.* Mr. De Cay told plaintiffs their title to the property would be valid once the

---

[2] Mrs. Gridnev, Murphy, and Keane, all of whom are plaintiffs in this action, were among the investors who contacted Mr. Brier.

Case No. 3:16cv142-MCR-CJK

subdivision plan was approved and allowed plaintiffs until such time to make a decision as to the terms of the settlement. *Id.* He also informed plaintiffs that, in the event they elected to retain the property, Mr. Davis would cover the cost of processing the deeds. *Id.* Shortly thereafter, Mr. De Cay sent plaintiffs a copy of the plot plan allegedly being submitted for approval. *Id.*

Although Mr. De Cay was not a party to the land purchase agreements, plaintiffs claim he had a personal interest in the matter because he owned property in the same proposed subdivision and feared the negative publicity would impede approval – and, ultimately, success – of the development. *Id.* In fact, Mr. De Cay made his interest clear in a number of emails to plaintiffs in connection with his attempt to resolve the matter before any further impact to the value of his property. A few days prior to signing the settlement agreement, for example, Mr. De Cay commented "each day this war goes on the wholesale value of our lots drop. By the end of next week I think the ocean front lots will be down to $15,000 to $20,000." Doc. 18-7.

Plaintiffs and Mr. De Cay executed a settlement agreement on or about March 31, 2015, agreeing to the following terms:

    (1)    all criminal investigations would be dropped;

    (2)    all negative information on plaintiffs' websites would be removed;

> (3) Mr. Davis and his associates would cease all false or deceptive marketing practices;
>
> (4) Mr. De Cay would pay plaintiffs $40,000 per lot, for a total of $160,000;
>
> (5) upon completion of the payments, plaintiffs would transfer their interests in the lots to Mr. De Cay via quitclaim deed;
>
> (6) Plaintiffs retained an option to re-purchase the lots from Mr. De Cay within one year for an additional $10,000 per lot; and
>
> (7) Plaintiffs would receive bi-monthly status updates on subdivision approval.

*Id.* Defendant made payments under the settlement agreement for a few months and corresponded with plaintiffs to confirm the amounts paid, as well as those outstanding. *Id.* He also updated plaintiffs on the status of the subdivision's approval, which he indicated was imminent. *Id.* At the same time, however, Mr. De Cay suggested he was having financial difficulties and was depending on the sale of a condominium in order to continue payment under the settlement agreement. *Id.* According to plaintiffs, things then "fell apart."

On August 17, 2015, Mr. De Cay admitted the condominium he was trying to sell did not appraise for what he expected and the sale therefore might fall through. *Id.* His September payment was late, but he indicated the sale of the condominium would be consummated the following month and the parties would then "be 'done.'" *Id.* The October payment also was late. *Id.* Finally, on

November 2, 2015, Mr. De Cay informed plaintiffs his condominium had not sold and he could not make that month's payment. *Id.* He requested a 30-day extension, stating he would make two payments on December 1 and tender a late fee of $500 per lot. *Id.*

After Mr. De Cay again failed to timely make payment, plaintiffs contacted him and were informed the sale of the condominium was "'a bust.'" *Id.* De Cay promised to withdraw money from his 401k account in order to make payment under the settlement agreement. *Id.* Shortly thereafter, however, Mr. De Cay claimed his request to withdraw money from his 401k was rejected because he had already withdrawn the maximum allowed. *Id.* Plaintiffs claim they subsequently discovered Mr. De Cay had liquidated his 401k 9 months earlier, in March 2015.

As a result of defendant's failure to perform under the original settlement agreement, the parties executed an amended agreement on December 13, 2015, which allowed Mr. De Cay more time to make payment but imposed additional late fees. *Id.* Pursuant to the amended agreement, Mr. De Cay was to pay $1,500 in late fees per lot, bringing the total balance due to $94,000, to be paid on or before January 15, 2016. *Id.* One week later, Mr. De Cay claimed more problems withdrawing money from his 401k and anticipated not being able to perform under the amended agreement. *Id.* On January 14, 2016, he admitted his condominium never sold, he had not received expected payment from Mr. Davis, and his wife

would not allow him to withdraw any more from his 401k. *Id.* According to plaintiffs, defendant promised to pay plaintiffs all amounts owed, but indicated he needed additional time. Plaintiffs received no further payment from Mr. De Cay. *Id.*

Plaintiffs initiated this action on March 31, 2016, asserting a straightforward claim against Mr. De Cay for breach of contract and seeking $94,000 in damages. Mr. De Cay filed an answer and counterclaim against plaintiffs, arguing they blackmailed him through negative publicity. De Cay seeks an unspecified amount of damages and "all property rights to lots 70 and 73 along with a signed sales agreement to lot 68 (lot was recorded in the past) or a refund of all money paid to each member of the group by Mr. De Cay."

On May 16, 2016, plaintiffs served their first request for admissions. In response, defendant admitted he entered into an original and amended settlement agreement with plaintiffs under which he was required to pay a total of $94,000 on or before January 15, 2016; he also admitted he failed to pay that amount. Mr. De Cay thus does not deny he failed to fully perform under the agreement; instead, he contends the agreement was illegal and unenforceable because plaintiffs blackmailed him, did not have clear title to the property, and defendant had no issues to settle with plaintiffs. Defendant also argues the agreements are invalid

Case 3:16-cv-00142-MCR-CJK   Document 26   Filed 03/01/17   Page 8 of 17

Page 8 of 17

because they were intended for the illegal purpose of tax evasion. Finally, defendant challenges venue.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56(a) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *Id.* Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995).

Generally, for purposes of summary judgment, a court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). Nevertheless, "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" *Vega v. Invesco Group, Ltd.*, 432 F. App'x 867, 869-70 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (*citing Anderson*, 477 U.S. at 251).

## DISCUSSION

In diversity actions, such as this, the court "applies the substantive law of the state in which it sits except in cases governed by federal law or the United States Constitution." *Rosa and Raymond Parks Inst. for Self Dev. v. Target Corp.*, 812 F.3d 824, 829 (11th Cir. 2016). In Florida, as in other states, "[t]he elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP*, 137 So. 3d 1081, 1094-95 (Fla. 3d DCA 2014). With regard to the first element, "[t]he creation of a contract requires that there be a mutual or reciprocal assent to a certain and definite

proposition, which is commonly referred to as a meeting of the minds." *Glosser v. Vasquez*, 898 So. 2d 1179, 1181 (Fla. 3d DCA 2005).

"The cardinal rule of contract interpretation is that when the language of a contract is clear and unambiguous, the contract must be interpreted and enforced in accordance with the plain meaning." *R.J. Reynolds Tobacco Co. v. Webb*, 187 So. 3d 388, 392 (Fla. 1st DCA 2016). "Where there is an unambiguous contractual provision . . . , a trial court cannot give it any other meaning beyond that expressed and must construe the provision in accord with its ordinary meaning." *Id.* (internal marks omitted). In other words, "[c]ourts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Harrington v. Citizens Prop. Ins. Corp.*, 54 So. 3d 999, 1002 (Fla. 4th DCA 2010) (internal marks omitted). "A contract should be considered as a whole in determining the intention of the parties to the instrument." *Aristech Acrylics, LLC v. Lars, LLC*, 116 So. 3d 542, 544 (Fla. 3rd DCA 2013) (internal marks omitted). "And a court must construe a contract in a manner that accords with reason and probability; and avoid an absurd construction." *Id.* (internal marks omitted).

"Under Florida law, courts apply an objective test in deciding whether an enforceable contract exists." *Miles v. Nw. Mut. Life Ins. Co.*, 677 F. Supp. 2d 1312, 1315 (M.D. Fla. 2009) (*citing Robbie v. City of Miami*, 469 So. 2d 1384,

1385 (Fla. 1985), for the proposition "it matters not whether there was 'the agreement of two minds in one intention, but on the agreement of two sets of external signs – not on the parties having meant the same thing but on their having said the same thing'"). Accordingly, defendant's subjective intent in entering into the original and amended settlement agreements "is irrelevant to the Court's consideration of [whether a valid and binding contract exists]." *Id.*

Here, the parties indisputably agreed to the terms set forth in both the original and amended settlement agreements. Those terms were clear and unambiguous and were intended to resolve the dispute between plaintiffs and Mr. Davis, which dispute defendant believed was negatively impacting the value of his property. Because the parties agreed upon the essential terms of the agreements at the time they entered into them, enforceable contracts were created. Defendant, however, admittedly failed to make payment under the amended agreement.

"Once an agreement to settle is reached, one party may not unilaterally repudiate it." *Reed ex rel. Reed v. United States*, 891 F.2d 878, 881 n.3 (11th Cir.1990) (*citing Gunn Plumbing, Inc. v. Dania Bank*, 252 So. 2d 1 (Fla. 1971)). Nevertheless, a court may decline to enforce a contract procured through fraud or duress. *See, e.g., Vitakis-Valchine v. Valchine*, 793 So. 2d 1094, 1096 (Fla. 4th DCA 2001)). In order to set aside a contract based upon a claim of duress, the moving party must show "(a) that the act sought to be set aside was effected

involuntarily and thus not as an exercise of free choice or will and (2) that this condition of mind was caused by some improper and coercive conduct of the opposite side." *City of Miami v. Kory*, 394 So. 2d 494, 497 (Fla. 3d DCA 1981). "Duress is a condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition." *Id.*

Here, defendant presents no evidence plaintiffs forced him to sign the settlement agreements or exercised any type of coercion or undue pressure. To the contrary, Mr. De Cay initiated the settlement discussions in an effort to protect the value of his property and negotiated with plaintiffs. *See* doc. 17. He had extensive communications with plaintiffs regarding the terms of the agreements; yet, at no time did he indicate in any way that he felt coerced or pressured by plaintiffs. *See* doc. 17. Moreover, he performed under the agreements for a period of time without objection, apologized to plaintiffs when he was unable to do so, and thanked them for their understanding. *See* docs. 18-12, 18-13, 18-14, 18-15, 18-16, and 18-18. He agreed to pay late fees in exchange for more time in which to comply and entered into the amended agreement in order to avoid the repercussions of default. *See* docs. 18-15 and 18-16.

Not only does the evidence show defendant initiated the settlement discussions that culminated in execution of the agreements, but it also reveals no

evidence of misconduct by plaintiffs, much less misconduct that would have any bearing on the settlement agreements. Defendant's claim of bribery is predicated upon the websites plaintiffs created and maintained to call attention to what they considered fraudulent practices of Mr. Davis. Notably, however, Mr. De Cay has not alleged – must less demonstrated – that any of the information contained on the websites was directed at him. The fact plaintiffs operated websites publicizing negative information about Mr. Davis does not constitute coercion against Mr. De Cay, and certainly not blackmail. It appears Mr. De Cay's dissatisfaction with the agreements is based on his inability to continue to perform under them and not with any perceived threat or coercion by plaintiffs. Mr. De Cay may not rescind the agreements merely because he has become dissatisfied with their terms, or because he found himself unable to perform.

To the extent defendant claims plaintiffs misrepresented their title to and interests in the subject property, such claim likewise fails. The elements of fraudulent misrepresentation and fraudulent inducement are: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (internal marks omitted); *GEICO Gen. Ins. Co. v. Hoy*, 136 So. 3d 647, 651 (Fla. 2d DCA 2013). Defendant has not alleged a

false representation by plaintiffs. The only alleged falsity on which he relies is the claim plaintiffs did not have transferable title due to lack of approval of the subdivision but nevertheless agreed to convey title to their property as part of the settlement agreement. There is no evidence plaintiffs made any representation regarding their title to the property. Moreover, Mr. McCay was aware of the questionable title at the time he entered into both the initial and amended settlement agreements and thus could not have relied on any indication to the contrary. *See Moriber v. Dreiling*, 194 So. 3d 369, 374 (Fla. 3d DCA 2016) (noting "adverse parties negotiating a settlement agreement in an attempt to avoid litigation cannot rely upon the representations of one another"). In any event, plaintiffs agreed to convey property to defendant by quitclaim deed, which requires no specific interest and conveys whatever interests plaintiffs hold. *See* doc. 17.

Defendant's claim the agreements were illegal likewise is unavailing. Defendant contends plaintiffs entered into the agreements to avoid paying taxes on the transfer of the property. There is no indication of such intention in the language of the agreements themselves. Indeed, the agreements do not even suggest they were made for an improper purpose, let alone expressly require illegal action. And because the agreements are clear and unambiguous, the court cannot invalidate them on that basis.[3]

---

[3] According to plaintiffs, Mr. Brier reported the payments to the IRS and the other plaintiffs suffered losses and thus were not required to report the payments.

The fact the property may have been worthless or plaintiffs may have received payment from defendant in amounts equal to what they paid for the property is of no consequence, as the agreements were the result of open negotiations and specified a sum certain defendant was required to pay. Defendant admittedly failed to pay that amount. *See* doc. 18-22. Defendant thus breached his contracts with plaintiffs, resulting in damages to plaintiffs in the amount of $94,000.

Finally, defendant's venue argument is unavailing. Pursuant to 28 U.S.C. § 1391, a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Because Mr. Brier resides in the State of Florida and received payment under the agreements here, a substantial part of the events or omissions giving rise to plaintiffs' claim occurred in Florida. Moreover, defendant waived any argument

regarding improper venue by failing to assert it as an affirmative defense or raising it in a motion prior to serving his responsive pleading and actively participating in the lawsuit, including filing a counterclaim against plaintiffs.  *See* Fed. R. Civ. P. 8(c) and 12(b); *see also Hoffman v. Blaski*, 363 U.S. 335, 343 (1960) ("Of course, venue, like jurisdiction over the person, may be waived.  A defendant, properly served with process by a court having subject matter jurisdiction, waives venue by failing seasonably to assert it, or even simply by making default.").

Accordingly, it is respectfully RECOMMENDED:

1. That plaintiffs' motion for summary judgment (doc. 16) be GRANTED and that plaintiffs be awarded $94,000.00 in damages against defendant.

2. That defendant's motion for summary judgment (doc. 20) be DENIED and his counterclaim dismissed with prejudice.

3. That the clerk be directed to close the file.

At Pensacola, Florida, this 1st day of March, 2017.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.
UNITED STATES MAGISTRATE JUDGE**

Case 3:16-cv-00142-MCR-CJK   Document 26   Filed 03/01/17   Page 17 of 17

Page 17 of 17

NOTICE TO THE PARTIES

      Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>. A copy of objections shall be served upon the magistrate judge and all other parties. A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on objected-to factual and legal conclusions. *See* U.S. Ct. App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.